**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | : | |
| GMAC MORTGAGE LLC | : | CIVIL ACTION |
| f/k/a GMAC MORTGAGE CORPORATION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 13-4950 |
| | : | |
| SOUTHPORT BANK, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                                                **APRIL 9, 2015**

Presently before the Court are Cross-Motions for Summary Judgment filed by Plaintiff

GMAC Mortgage LLC ("GMACM"), formally known as GMAC Mortgage Corporation, and

Defendant Southport Bank ("Southport").  For the following reasons, GMACM's Motion for

Summary Judgment is granted, and Southport's Motion for Summary Judgment is denied.

## I.  INTRODUCTION

Southport's residential mortgage business operated under a division called ComCor

Mortgage ("ComCor").  (GMACM's  Mem. Law Support Mot. for Summ. J. at 3) (citing Dep. of

Paul W. Otto ("Otto") (Southport's Senior Vice President and CFO) p. 16, lines 19-24.)

Southport's ComCor division sold tens of millions of dollars of loans to GMAC Bank

("GMACB"), and its affiliate, GMACM (GMACB and GMACM are collectively referred to as

"GMAC").  (Id.)  For example, Southport's ComCor division sold GMAC a total of 140 loans

valued at $28,587,015 during a six-month period in 2008, which accounted for approximately

98% of the total loans originated by Southport during this time period.  (Id.)  On December 31,

2008, Southport's ComCor division ceased doing business as a result of Southport incurring heavy losses related to its mortgage business.  (Id.)

On or about March 23, 2006, Southport entered into a Correspondent Agreement ("The Agreement") with GMAC for the sale and purchase of residential mortgage loans.  The Agreement expressly incorporates the Correspondent Manual ("Manual"), which contains approximately 530 pages of highly-detailed requirements that Southport must comply with when originating and selling loans to GMAC.[1]  (See Manual.)  Pursuant to the Agreement, Southport offered for sale, and GMAC purchased, residential mortgage loans originated by Southport. GMAC paid Southport/ComCor a premium for each loan that it purchased under the Agreement. (GMACM's  Mem. Law Support Mot. for Summ. J. at 3) (citing Otto Dep. p. 81-82.)  In the Amended Complaint, GMAC has sought the repurchase of 17 residential mortgage loans totaling $3,533,162.55, which were originated by Southport and purchased by it (the "Subject Loans").[2]

Southport sold each of the Subject Loans to GMACB, which immediately transferred them to its affiliate, GMACM, which subsequently sold them to Fannie Mae ("FNMA") or Freddie Mac.  In late 2010 through mid-2011, FNMA and Freddie Mac determined that the Subject Loans were defective and required GMACM to repurchase the loans, causing GMACM

---

[1]There are eight operative versions of the Manual governing the Subject Loans; however, none of the Manual provisions at issue changed in any material way between versions.  (GMACM's  Mem. Law Support Mot. for Summ. J. at 2 n.3.)  For simplicity, all references made to the Manual are made to the May 2008 version.  (Id.) (citations omitted)  The Agreement states that "[t]o the extent there are differences between requirements as stated in the Correspondent Manual and as stated in this Agreement, the provisions of this Agreement shall control." (Agreement ¶ 17.)

[2]The Amended Complaint fails to list any monetary amount for damages.  See Am. Compl.  Instead of stating a damages amount, it states "!The Formula Not In Table."  Id.  The Amended Complaint's Exhibit B states that the damages total $3,541,532.64, but GMACM's Motion for Summary Judgment states that damages total $3,533,162.55.  Id., Ex. B; GMACM's Mot. for Summ. J.  Based upon GMACM's summary judgment filings and supporting documentation, which includes revised monetary amounts, the Court relies upon its damages request of $3,533,162.55.

2

to incur substantial losses.  Relying upon the Agreement, GMACM demanded that Southport repurchase the loans and/or indemnify it for its losses in the amount of $3,533,162.55.[3] Southport refused by denying that it is obligated to repurchase the Subject Loans under the Agreement.  In addition, Southport argues that it does not need to indemnify GMAC for its losses under the Agreement.  Also, Southport argues that GMAC's demand for damages in the amount of $3,533,162.55 is legally and factually unsupported.

On July 19, 2013, GMACM filed a Complaint commencing this lawsuit in the Court of Common Pleas of Montgomery County, which was subsequently removed to this Court on August 23, 2013.[4]  On October 7, 2014, GMACM filed an Amended Complaint with the following two counts: (1) Count I - Breach of Contract and (2) Count II - Indemnity.  GMACM seeks $3,533,162.55 in damages, as well as attorneys' fees and costs pursuant to the Agreement.[5] Southport filed an Answer and countersued for attorneys' fees and costs that it has incurred in

---

[3] GMACM did not immediately forward its repurchase demands to Southport because it mistakenly believed that Southport ceased doing business in 2008 when ComCor ceased doing business.  (GMACM's Mem. Law Support Mot. for Summ. J. at 3) (citations omitted)  In November 2011, GMACM sent letters to Southport demanding repurchase after discovering that Southport was still in business.  (Id.)  The Agreement states that "GMACB's delay or failure to enforce any provision of this Agreement shall not constitute a waiver of that provision or any other provision or agreement with Correspondent."  (Agreement ¶ 12.)

[4] The court has subject matter jurisdiction under 28 U.S.C. § 1332.  The Agreement explicitly sets forth that it "shall be governed by, construed and interpreted in accordance with the laws of the Commonwealth of Pennsylvania."  (Agreement ¶ 21.)

[5] In the Agreement, the Section entitled "Jury Waiver/Attorney Fees and Expenses" states:

> If any legal action or proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach or default in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to immediately recover from the other party, its costs, plus reasonable attorneys' fees incurred in such action(s) or proceeding(s) in addition to any other relief to which it may be entitled.

(Agreement ¶ 11.)

defending this action.

The parties have filed Cross-Motions for Summary Judgment, as well as Responses, Replies and supplemental briefing.  For the reasons below, GMACM's Motion for Summary Judgment will be granted, and Southport's Motion for Summary Judgment will be denied.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  See Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991).  The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "A fact is material if it could affect the outcome of the suit after applying the substantive law.  Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'"  Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts

4

showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. Tziatzios v. United States, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996). If the court determines that there are no genuine issues of material fact, then summary judgment will be granted. Celotex, 477 U.S. at 322.

## III.  DISCUSSION

### A.  *Indemnification*

"Under Pennsylvania law, indemnity is available only (1) 'where there is an express contract to indemnify,' or (2) where the party seeking indemnity is vicariously or secondarily liable for the indemnitor's acts." Bank v. City of Phila., 991 F. Supp. 2d 523, 530 (E.D. Pa. 2014) (quoting Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 448 (3d Cir. 2000)). In this case, the Agreement, which incorporates the Manual, is the express contract to indemnify.

The Agreement unambiguously provides that Southport "shall indemnify and hold GMACB, and its affiliates [GMACM], harmless from losses (including the loss of servicing fees), damages, deficiencies, claims or expenses (including reasonable attorneys' fees) incurred by GMACB, or any of its affiliates [GMACM], to the extent required by and in accordance with the provisions of the Correspondent Manual." (Agreement ¶ 9.)  Regarding indemnification, the Manual provides:

> In addition to any other remedies of GMACB set forth herein or in the Correspondent Agreement, including but not limited to the provisions regarding repurchase, Correspondent shall indemnify and hold GMACB harmless . . . from losses (including loss of servicing rights), damages, deficiencies, claims or expenses

(including reasonable attorneys' fees and expenses) incurred by GMACB to the extent such loss, damage, deficiency, claim or expense results from or, in the case of a claim, is alleged to have resulted directly or indirectly from:

• Any circumstance that would constitute grounds for loan repurchase as set forth above.

• Any misrepresentation made by any borrower or by Correspondent in the Correspondent Agreement . . . including as such a misrepresentation, any representation or warranty by Correspondent in connection with the purchase of any loan which contains any statement untrue of any material fact or fails to state any material fact necessary to make the statement therein not misleading.

• Any breach of warranty by Correspondent, non fulfillment of any covenant or obligation of Correspondent contained in the Correspondent Agreement, in the Correspondent Manual . . . or default or failure to perform by Correspondent under the Correspondent Agreement.

• Any defect in any loan existing (including, but not limited to, those defects subsequently discovered), resulting from any act or omission of Correspondent, other originator, or prior servicer prior to the effective dates of loan transfer, or any act or omission of Correspondent after the effective date of loan transfer to the extent Correspondent is required pursuant to the Correspondent Agreement to deal in any way with a loan after the effective date of loan transfer.

• Any errors or omissions of Correspondent, other originator, or prior servicer in originating or servicing any of the loans (including but not limited to, incomplete or erroneous loan documentation . . .).

• Any fraud in the origination of any loan whether or not as a result of any act or omission of the Correspondent or the borrower under the loan.

(Manual, Section XIV.b "Indemnification")

A central issue addressed by the parties is whether Southport was a delegated underwriter under the Agreement.  Regarding the issue of "Delegated Underwriting," the Agreement states

6

that when a Correspondent's request for approval to be authorized as a delegated underwriter is

approved by GMACB in writing, "Correspondent is a delegated underwriter for certain

programs, [and] the Correspondent will be authorized to make credit commitments on behalf of

GMACB in compliance with applicable law and the Correspondent Manual."  (Agreement

¶ 3(c).)  The Manual's Chapter VIII, entitled "Underwriting," consists of more than 250 pages of

comprehensive and detailed underwriting standards for a delegated underwriter.  (See Manual

Chapter VII "Underwriting Authority and Options" and Chapter VIII "Underwriting")

Southport asserts that it was a non-delegated underwriter under the Agreement.[6]  As

Southport itself explained in its Response to GMACM's Motion for Summary Judgment,

> [a] delegated underwriter under the Agreement is authorized to
> make credit commitments on behalf of GMAC.  If a correspondent
> under the Agreement does not have delegated underwriting
> authority, it is required to submit loans to GMAC or its agent for
> underwriting.  The Agreement provides that 'correspondent may
> request approval to be authorized as a delegated underwriter' and
> that if such a request is approved by GMAC in writing, the
> correspondent will be vested with the authority to make credit
> commitments in accordance with terms specified by GMAC.

(Southport's Resp. in Opp'n GMACM's Mot. for Summ. J. at 1.) (internal citations omitted)

Southport states that "[a]bsent delegated underwriting authority, underwriting authority remained

with GMAC and it bore responsibility for underwriting the Subject Loans."  (Id. at 33; see also

Southport's Mem. Law Support Mot. for Summ. J. at 18.)  Therefore, according to Southport, "to

the extent there were any errors or omissions with respect to the Subject Loans or any fraudulent

information contained in the loan applications, responsibility for such would rest with GMAC."

---

[6]GMAC argues that its "ability to demand indemnification from Southport is not contingent on Southport's delegated underwriting status."  (GMACM's Sur-Reply at 6) (citing GMACM's Opp. Memo at 19-21.)  We do not need to address this issue since we find that Southport was a delegated underwriter.

(Id.)

Through its evidence, including the Declaration of Charles Laubach ("Laubach"), and the attached Exhibits A-F ("Laubach Declaration and Exhibits"), GMAC has established that Southport was approved as a delegated underwriter pursuant to the Agreement and underwrote each of the Subject Loans.[7]  Laubach is a Director of Claims for ResCap Liquidating Trust ("ResCap"), which is the successor in interest to GMACM.  (See Laubach Decl. ¶ 1.)  He was employed by GMAC as an Underwriting Manager and an Operations Manager from 2000 until 2004, and was a Credit Manager in GMAC's Credit Risk Department from June 2008 through August 2011.  (Id. ¶ 2.)  Laubach explains that "[t]he Credit Risk Department was responsible for approving correspondents to be delegated underwriters, recertifying delegated correspondents on an annual basis, monitoring delegated correspondents, and inactivating delegated correspondents when necessary." (Id. ¶ 3.)  He also explains that "[a]s Credit Manager, [he] was involved in all of these business operations."  (Id. ¶ 4.)  Laubach states that he has "personal knowledge of the Credit Risk Department's policies and procedures for approving correspondents to become delegated underwriters and the records that are created in the regular course of GMACM's business."  (Id.)

Regarding each individual exhibit from A through F, Laubach describes the nature of

---

[7]Southport has sought to exclude the use of the Laubach Declaration and Exhibits A-E based upon their belated submission and the assertion that Laubach does not have the requisite personal knowledge to authenticate the Laubach Exhibits A-E.  (See Southport's Mot. for Rule 37(c) Sanctions; Southport's Supp. Br. in Further Support Mot. for Summ. J.)  Upon consideration of the supplemental arguments by both sides, we find that Laubach properly authenticated the Laubach Exhibits A-E as business records through his relevant personal knowledge about the policies and procedures for approving correspondents to become delegated underwriters and the records that are created in the regular course of GMACM's business.  (See Laubach Decl.)  As such, we consider the Laubach Declaration and Exhibits A-E as evidence that Southport was a delegated underwriter pursuant to the Agreement. See Fed. R. Evid. 803(6); Fed. R. Civ. P. 56(c)(4).

each record.  (Id. ¶¶ 5-17.)  For the majority of the Exhibits, he states how they were maintained

in the ordinary course of GMAC's business.  (See id.)  Pertaining to the issue of whether

Southport was a delegated underwriter, the Laubach Declaration and Exhibits revealed, *inter*

*alia*, as follows:

1.   Southport submitted an application to GMAC on or about March 23, 2006,
     requesting to be approved as a delegated underwriter (Id., Ex. A.);

2.   an "Account Executive Write-Up" for Southport Bank by GMAC's Credit Risk
     Department showing that Southport requested to be a "fully delegated"
     underwriter for conventional and home equity loans (Id., Ex. B.);

3.   an email from an Assistant Credit Analyst from GMACM dated June 16, 2006
     (entitled "Southport Bank #50128 - Notification of Approval"), which was
     maintained in GMACM's Credit Risk Department's records regarding Southport,
     stating that Southport is a "Fully Delegated Client" that was "officially approved
     by Credit Risk" (Id., Ex. C.);

4.   a GMACB letter dated June 21, 2006, attached to an email from an employee of
     GMACB to a ComCor employee entitled "GMACB Client Approval," informing
     Southport that it has been approved as a Correspondent with delegated
     underwriting authority (Id., Ex. D.);

5.   a Correspondent Recertification Checklist for Southport completed by GMAC's
     Credit Risk Department on April 10, 2008, showing that Southport was a
     delegated correspondent for conforming loans[8] (Id., Ex. E.); and

6.   a screenshot from a loan origination software program called WALT used by
     GMAC showing that Southport was a delegated underwriter for conforming loans,
     among other types, as of June 16, 2006 (Id., Ex. F.).[9]

Furthermore, Laubach explained that "[i]f and when GMACM underwrites a loan, it

---

[8]According to Laubach, "[e]very delegated correspondent was required to submit a Client Recertification
Form to GMACM's Credit Risk Department on an annual basis so that the Department could recertify a
correspondent's delegated status."  (Laubach Decl. ¶ 9.)  He states that "[a]s part of this process, the Credit Risk
Department would complete a Correspondent Recertification Checklist."  (Id.)

[9]Laubach states that "[i]mmediately following a correspondent's approval as a delegated underwriter, the
Credit Risk Department would input this information into WALT."  (Laubach Decl. ¶ 16.)

would complete a 'Notice of Loan Approval' or a Form 1008, which would be completed and signed by a GMACM underwriter."  (<u>Id.</u> ¶ 11.)  According to Laubach, "[t]his record would always be maintained in the subject loan file."  (<u>Id.</u>)  Regarding the Subject Loans, Laubach states that "I have personally reviewed the loan files for all seventeen Subject Loans and have not located any Notice of Loan Approvals or Form 1008s that indicated GMACM underwrote the Subject Loans."  (<u>Id.</u> ¶ 12)

Additionally, Laubach explains that "[t]he Desktop Underwriter is a software program issued by Fannie Mae that allows correspondents to submit borrower information and determine whether Fannie Mae's underwriting criteria are met.  Included within the DU Underwriting Findings, is language identifying who submitted the information into the Desktop Underwriter program."  (<u>Id.</u> ¶ 13.)  Significantly, Laubach states:

> I have personally reviewed the DU Underwriting Findings for each of the seventeen Subject Loans, which were delivered to GMACM by Southport and have been incorporated into each loan file and made part of GMACM's business records.  Every DU Underwriting Finding states that the loan was submitted into the Desktop Underwriter program by COMCOR Mortgage, a division of Southport Bank, indicating that Southport underwrote every Subject Loan.

(<u>Id.</u> ¶ 14.)

Furthermore, Carol MacElree ("MacElree"), GMAC's Rule 30(b)(6) corporate designee, stated that Southport had delegated underwriting authority based upon her review of several documents, as well as DU Underwriting Findings and WALT screen shots.[10]  (GMACM's Mot. for Summ. J.; Attachment 3 (Dep. of MacElree) p. 30-32, 44-45.)  GMAC's own business

---

[10]MacElree has been employed as ResCap's Director of Claims Management since 2012.  (MacElree Decl. ¶ 1.)

records, specifically, its Repurchase Summary and Authorization Forms for the vast majority of the Subject Loans, indicate that Southport was a delegated underwriter.  (GMACM's Mem. Law Opp'n Southport's Mot. for Summ. J. at 5; MacElree Dep. Exs. 20, 32, 37, 42, 47, 51, 56, 61, 69, 78, 82, 89, 92, 96, 101.)

In addition, Southport's own business records for each of the Subject Loans contain a "ComCor Mortgage Conventional Loan Approval" form.  (GMACM's Mem. Law Opp'n Southport's Mot. for Summ. J. at 4, Ex. 105.)  Craig Robertson ("Robertson") is identified on the majority of the Loan Approvals as the person responsible for underwriting the loan.  (Id.) Southport admits that it employed Robertson as an underwriter.  (Id.; Otto Dep. at 78.)

In light of all of the aforementioned evidence, we find that GMAC has established that Southport was, indeed, a delegated underwriter under the Agreement and Manual.  As such, Southport, according to its own argument, is responsible for any errors or omissions regarding the Subject Loans or any fraudulent information contained in the loan applications.[11]  (See Southport's Resp. in Opp'n GMACM's Mot. for Summ. J. at 33.)  There appears to be no question that the Subject Loans contained, *inter alia*, errors, defective appraisals, borrower misrepresentations, omissions, and fraud.  Therefore, Southport is responsible to indemnify GMAC pursuant to the Agreement, as well as the Correspondent Manual.

---

[11] "Each of the seventeen Subject Loans was originated through a Third Party Originator ('TPO'), also known as a mortgage broker."  (GMAC's Mem. Law Support Mot. for Summ. J. at 8.) (citing Otto Dep., Ex. 105.) "Southport extensively relied on mortgage brokers to originate new business, gather all documents and information from the borrowers, submit that information into the underwriting system, and close the loans." (Id.) (citing Otto Dep. p. 29, lines 11-16; p. 57-58, p. 79-80.)  Southport acknowledges that its involvement in the loan origination process was limited to providing mortgage brokers loan pricing, funding the loan, and shipping the loan documentation to the investor.  (Id. at 9.)  Southport did not verify the accuracy of any loan information submitted by the mortgage brokers.  (Id.) (citing Otto Dep. p. 60-61, 89-90.)  The Manual sets forth that "Correspondent hereby makes all representations and warranties of the Correspondent Agreement and this Manual with respect to its TPOs." (Manual, Sec. XIII.c.1.)  It further states that "Correspondent acknowledges that it shall bear the responsibility for all actions and omissions of any of its TPOs and must underwrite all loans prior to closing."  (Id.)

### B. *Damages*

Since the Agreement requires Southport to indemnify GMAC, and Southport has unjustifiably failed to do so, the next question is what damages are appropriate.  When Southport failed to indemnify GMAC, it breached Section 9 of the Agreement, entitled "Indemnification and Repurchase."  (Agreement ¶ 9.)  GMAC states that it has expended $3,533,162.55, exclusive of attorneys' fees and costs, in damages, which includes unpaid principal balances, interest and advances paid to FNMA, purchase price premiums, administrative fees, other income, or sale proceeds.[12]  See McClure v. Deerland Corp., 585 A.2d 19, 22 (Pa. Super. Ct. 1991) (stating that, under Pennsylvania law, "[c]laims for indemnification arise only when the party seeking indemnity has made a payment on the underlying claim").

Under Pennsylvania law, in order to prove damages for a breach of contract, the plaintiff "must give a factfinder evidence from which damages may be calculated to a 'reasonable certainty.'"  Ware v. Rodale Press, Inc., 322 F.3d 218, 225-26 (3d Cir. 2003) (quoting ATACS Corp. v. Trans World Comm., Inc., 155 F.3d 659, 668 (3d Cir. 1998)).  "At a minimum, reasonable certainty embraces a rough calculation that is not 'too speculative, vague or contingent' upon some unknown factor."  Id. (quoting ATACS Corp., 155 F.3d at 669).  Pennsylvania law allows "some uncertainty" in calculating damages for a breach of contract; however, "while mathematical certainty is not required, the plaintiff must introduce sufficient facts upon which the jury can determine the amount of damages without conjecture."  Id. at 226

---

[12] GMACM's Breach of Contract and Indemnification claims request the same exact damages amount of $3,533,162.55, plus attorneys' fees and costs.  See Kane v. The BOC Gr., Inc., 234 F.3d 160, 166 (3d Cir. 2000) (stating that a breach of contract claim is entirely separate and distinct cause of action from an indemnification count).

(quoting Delahanty v. First Penn. Bank, N.A., 464 A.2d 1243, 1257 (Pa. Super. Ct. 1983)).

Here, there is sufficient evidence for the Court to base its award of damages because GMAC has provided detailed damage calculations supported by business records.  Specifically, GMAC has presented a series of Make Whole Calculations for each of the Subject Loans, created in the course of its regular course of business, demonstrating that it has incurred $3,533,162.55 in damages, exclusive of attorneys' fees and costs.[13]  GMAC presented deposition testimony from its Rule 30(b)(6) witness, MacElree, establishing that each Make Whole Calculation was created in the regular course of GMAC's business and prepared by reviewing other business records reflecting the loan's principal balance, interest, purchase price premium, sale proceeds, and other line items.  (See GMACM's Reply at 10-14.) (citations omitted)  MacElree also stated that she reviewed each Make Whole Calculation and the supporting business records with the two employees responsible for creating the Make Whole Calculations, and that she independently reviewed and confirmed the accuracy of each Make Whole Calculation.  (Id. at 10-11) (citing MacElree Dep.; Decl. of John Larson (ResCap's Risk Analyst) ¶¶ 1-7.)

Southport argues that GMAC's calculations are unsupported, but fails to submit any evidence specifically disputing them.  Southport relies upon the deposition testimony of its Executive Vice President & Chief Credit Officer, Carl R. Cecelia ("Cecelia"), which questions the amounts of the Make Whole Calculations, as well as the sufficiency of their supporting

---

[13]The "Make Whole Calculations consist of unpaid principal, interest, and the purchase price premium, less any amount recouped by either FNMA or GMACM via a REO [Real Estate Owned] sale of the property following a foreclosure action, by a subsequent note sale by GMACM, or a PMI premium refund."  (GMACM's Mem. Law Support Mot. for Summ. J. at 48.) (citing MacElree Dep. p. 100-107, 262-64.)  The Make Whole Calculations primarily consist of the following line items: unpaid principal balance; interest; interest paid to FNMA; GMAC advances; FNMA advances; escrow advances; purchase price premium; PMI premium refund; administrative fee; other income; and sale proceeds.

documentation.[14]  While Southport argues against the Make Whole Calculations, it fails to offer any material evidence to specifically rebut GMAC's calculations or the documentation that it relied upon in making those calculations.  See Amerisourcebergen Drug Corp. v. Meier, No. 03-6769, 2004 WL 2900702, at *11 (E.D. Pa. Dec. 14, 2004) (granting summary judgment in favor of plaintiff awarding $931,576.77 in damages, in part, because defendant failed to dispute plaintiff's damages calculations).

Upon review of GMAC's damages evidence, we find that it has met its burden by providing sufficient evidence from which damages may be calculated to a reasonable certainty. There is sufficient evidence for us to determine the amount of damages that GMAC is entitled amounts to $3,533,162.55, exclusive of attorneys' fees and costs, without guesswork or conjecture.  As such, we conclude that GMAC has proven damages of $3,533,162.55, exclusive of attorneys' fees and costs.

### 1. *Mitigation of Damages*

Southport asserts that GMAC failed to mitigate its damages claims relating to the Subject Loans in the following three categories: (1) the loss calculations including claims related to Loan Notes that were sold in the GMAC bankruptcy proceeding; (2) loss calculations including claims relating to REO properties that were sold by FNMA; and (3) loss calculations including claims relating to REO properties that were sold by GMAC.

"Mitigation is an affirmative defense, for which the breaching party bears the burden of

---

[14]GMAC argues that Cecelia's cited testimony regarding the adequacy of its supporting documentation involving its claimed damages is temporally limited to GMACM's initial pre-suit repurchase demand.  (GMACM's Reply at 13.)  GMAC asserts that "to the extent he opines as to whether GMACM produced adequate supporting documentation in litigation, such a vague and generalized objection is insufficient to defeat summary judgment in light of GMACM's detailed damage calculations supported by business records."  (Id.) (citation omitted)

proof." Prusky v. ReliaStar Life Ins. Co., 532 F.3d 252, 258 (3d Cir. 2008) (citing Koppers Co., Inc. v. Aetna Cas. & Sur. Co., 98 F.3d 1440, 1448 (3d Cir. 1996); Williams v. Masters, Mates & Pilots of Am., 120 A.2d 896, 901 (1956)). "To prove a failure to mitigate, one must show: '(1) what reasonable actions the plaintiff ought to have taken, (2) that those actions would have reduced the damages, and (3) the amount by which the damages would have been reduced.'" Id. (quoting Koppers, 98 F.3d at 1448). "Damages that could have been 'avoided with reasonable effort without undue risk, expense, burden, or humiliation will be considered . . . as not being chargeable against the defendant.'" Id. (quoting Williston on Contracts § 64:27 at 195). "Reasonableness 'is to be determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the situation at the time the problem was presented.'" Id. (quoting In re Kellett Aircraft Corp., 186 F.2d 197, 198 (3d Cir. 1950)).

There is no doubt that the mitigation of damages is a practicable issue given the nature of the real estate market, as well as the large damages demand made by GMAC. However, Southport has failed to meet its burden regarding all three categories of damages pertaining to the Subject Loans. Specifically, it has not established what reasonable actions GMAC should have taken that would have reduced the damages, and the amount by which the damages would have been reduced.

a. *GMAC's Damages Claims Related to Note Sales Sold During GMAC's Bankruptcy*

The first category of damages calculations at issue is GMAC's damages claims related to Loan Note sales. This category involves damages claims that incorporate financial information from Loan Notes sold through the GMAC bankruptcy that include the following five Subject

Loans: Jaber; Faraj; Guzman; the Second MacLaurin Loan; and Waddy.[15]  (Southport's Resp.

Opp'n GMACM's Mot. for Summ. J. at 13.) (citations omitted)  At the time that the Mortgage

Notes were sold through the bankruptcy, they were included with a large number of loans as a

package or a bundle.  (Id.) (citation omitted)

Southport attacks these damages claims arguing that GMAC is unable to support its

information based on its Rule 30(b)(6) designee, MacElree, because she was not knowledgeable,

and GMAC is unable to support the information on the Make Whole Calculations, except in

general terms.  (Id. at 15.)  Southport relies upon the deposition testimony of Cecelia, which

questions the adequacy of the Note sale proceeds asserting that they are not supported by

documentation.  (Id. at 13-16.)  Notably, Cecelia disputes GMAC's calculations and asserts that

they are unsupported by documentation; however, he does not offer any calculations based upon

documentation of his own showing what the correct damages actually are or should be based

upon actual supporting documentation.

We previously found that GMAC has provided detailed damages calculations supported

by business records sufficient for the Court to base its award of damages of $3,533,162.55.

Regarding the five Subject Loans damages pertaining to Note sales, Southport has not

specifically shown what reasonable actions GMAC ought to have taken to mitigate its damages

or how those actions would have reduced the damages.  See Prusky, 532 F.3d at 258.  Moreover,

Southport has not established any specific amounts by which the damages would have been

reduced.  Id.  Viewing all of the facts and circumstances of each Subject Loan, and judging them

---

[15]For purposes of brevity, we refer to the Subject Loans by the last name of the borrower, which is the same way that the parties refer to them.

in the light of one viewing the situation at the time the problem was presented, it appears that GMAC acted reasonably regarding the damages of these Subject Loans.  Without presenting specific factual evidence to the contrary, Southport has not met its burden.  Consequently, we deny Southport's mitigation argument pertaining to GMAC's damages claims related to Note sales sold through the GMAC bankruptcy.[16]

      b.  *GMAC's Damages Claims Related to REO Properties Sold By FNMA & GMAC*[17]

The second category of damages calculations includes claims relating to REO properties that were sold by FNMA with damages alleged by GMAC incorporating information received by it from FNMA.  (Southport's Resp. Opp'n GMACM's Mot. for Summ. J. at 17, 47.) Specifically, this category involves the following six Subject Loans:  Armstrong; Bradford; Franklin; the First MacLaurin Loan; Rubio; and Sanchez.[18]  (Id.)  These loans incorporate financial information from FNMA that includes sales of property.  (Id.)

---

[16]Southport asserts that it should be released from any indemnification obligation regarding the Jaber Loan because GMAC unilaterally acted to materially and substantially modify the terms of the loan by entering into a modification agreement whereby the borrower's principal balance was reduced by $147,000, and an additional $977.23 in "interest forgiveness" was added.  (Southport's Resp. Opp'n GMACM's Mot. for Summ. J. at 15-16, 43-44.)  Southport argues that the modification was made approximately six months after GMAC had made its repurchase demand to Southport and failed to tell it about the new modification agreement.  (Id. at 15, 42.)  As a result, GMAC increased its purported damage claim by almost $150,000.  (Id. at 42.)  GMAC argues, and we agree, that Southport has not shown any provision of the Agreement or Manual requiring Southport's consent prior to entering into a loan modification agreement or that Southport is released from its repurchase or indemnification obligations if GMAC enters into a loan modification agreement.  (GMAC's Reply at 13-14.)

[17]The second and third categories of damages calculations are jointly considered.

[18]Southport points out that GMAC raises the issue that Southport received FraudGuard reports prior to the closings of the Armstrong, Bradford, and First MacLaurin Loans.  (Southport's Resp. Opp'n GMACM's Mot. for Summ. J. at 34 n.13.)  "Each of these FraudGuard reports indicated that the valuations attributed to each of the properties secured by the loans may be suspect."  (Id.)  GMAC claims that Southport should have taken additional action in response to the FraudGuard Reports.  (Id.)  Based upon the erroneous premise that it was a non-delegated underwriter, Southport asserts that GMAC retained responsibility for underwriting the three loans and cannot simply pass its underwriting obligations on to it in light of the language of the Agreement.  (Id.)  Southport goes on to state that it does not appear that GMAC ever took any action to confirm the origination appraisals in the underwriting process.  (Id.)

Southport asserts that the damages calculations of the aforementioned Subject Loans, which include exceedingly low sale proceeds compared to the appraised property value, are unsupported by information or documentation because GMAC simply relied upon information provided by FNMA.  (Id.) Southport points out that low sale proceeds in contrast with high appraisal values indicate a failure to properly mitigate the loan loss.  (Id. at 48-50.)  It also points out that Cecelia questioned the documentation and sources of the sales numbers during his deposition, and, as such, Southport would question whether GMAC used its best efforts to mitigate its losses.  (Id.)

The third category of damages calculations involves GMAC REO sales in which GMAC is not relying on information purportedly provided by FNMA, but rather information originating from files and records within GMAC's control.  (Id. at 19, 51.)  This category involves the following six Subject Loans: Fawbush; Fenner; Gangannagari; Gutierrez; Lopez; and Ntim.  (Id. at 51.)  Several of these loans reflect REO sale proceeds that Southport argues are extremely low in light of the appraised values of the properties, which, in some cases, are a fraction of the appraised value of the property.  (Id.)  Again, Southport relies on Cecelia's deposition testimony questioning the documentation and sources of the sales numbers, and whether GMAC properly mitigated its losses.  (Id. at 50-54.)

GMAC counters Southport's arguments by pointing out that Southport bears the burden of proving that GMAC failed to mitigate its damages.  (GMACM's Reply at 15.)  GMAC argues that Southport relies solely upon Cecelia's speculative and unsubstantiated testimony questioning the sales prices, and fails to support its argument with any appraisal or broker price opinions as of the sale date demonstrating that the actual sale prices were unreasonably low.  (Id.)  GMAC

asserts that Southport only offers the speculative and unsubstantiated testimony of Cecelia where he questions the sale prices and whether GMAC properly mitigated its loan losses.  (Id.)  GMAC argues that Cecelia's opinions appear to only be based upon the fact that the sale prices were much lower than the original appraisals.  (Id. at 15.)  Regarding this assertion, GMAC notes that "for many of the Subject Loans, [it] has proven these same original appraisals grossly overvalued the properties," and many of the original appraisals were performed in 2008 during the height of the real estate market bubble, which was followed by one of the greatest housing crashes in United States history.  (Id. at 15 n.6.)  Regarding the Subject Loans involving REO sales by FNMA, GMAC points out that any failure to mitigate would be FNMA's responsibility because it entirely controlled the process and only notified GMAC of the sales once it sent demand letters.  (Id. at 16.)

Under Pennsylvania law, it is clear that Southport has failed to meet its burden of proof regarding the mitigation of damages pertaining to the Subject Loans of the REO properties that FNMA and GMAC sold.  Just as with the first category of damages calculations, Southport has failed to provide any specific evidence regarding what reasonable actions GMAC should have taken.  See Prusky, 532 F.3d at 258.  Also, it has failed to show that those actions would have reduced the damages, and the amount by which the damages would have been reduced.  Id. Moreover, it has not presented any evidence setting forth the amounts of appropriate sales prices if GMAC had "reasonably" acted.  Cecelia questions GMAC's mitigation of the damages, and says that its figures are not supported by proper documentation; however, he only offers speculation and does not present any solid evidence of monetary amounts with which the Court could work.  Without providing any practical evidence showing what reasonable actions GMAC

should have taken, and how those actions could have reduced the damages calculations by certain amounts, Southport fails to show that GMAC's actions were unreasonable at the time that the situations presented themselves.

## IV. CONCLUSION

Under the Agreement, and the Correspondent Manual, Southport was a delegated underwriter of the Subject Loans.  There appears to be no question that the Subject Loans contained, *inter alia*, errors, defective appraisals, borrower misrepresentations, omissions, and fraud.  Consequently, Southport is responsible to indemnify GMAC pursuant to the Agreement, and the Correspondent Manual.

When Southport failed to indemnify GMAC, it breached Section 9 of the Agreement, entitled "Indemnification and Repurchase."  GMAC demanded that Southport repurchase the loans and/or indemnify it for its losses in the amount of $3,533,162.55, exclusive of attorneys' fees and costs, which includes, *inter alia*, the unpaid principal balances, interest and advances paid to FNMA, purchase price premiums, administrative fees, other income, or sale proceeds. GMAC established its damages with the requisite degree of reasonable certainty required by Pennsylvania law by providing detailed damages calculations supported by business records.  See Ware, 322 F.3d at 225-26.  Southport argued that GMAC failed to mitigate its damages; however, we find that it has failed to meet its burden of showing what reasonable actions GMAC should have taken, that those actions would have reduced the damages, and the amount by which the damages would have been reduced.  See Prusky, 532 F.3d at 258.  As a result, we conclude that GMAC's damages request in the amount of $3,533,162.55, exclusive of attorneys' fees and costs, is reasonable.  As such, GMAC is entitled to damages in the amount of $3,533,162.55.

According to the terms of the Agreement, GMAC, as the prevailing party, is entitled to its costs, plus reasonable attorneys' fees and costs incurred in this action.  (See Agreement ¶ 11.) Consequently, Southport's counterclaim for attorneys' fees and costs is dismissed.  GMAC shall file documentation supporting its request for costs and attorneys' fees on or before April 23, 2015, and Southport shall file any response thereto on or before May 7, 2015.

In light of the above, and upon consideration of all of the arguments presented by the parties in their Cross-Motions for Summary Judgment, we grant GMACM's Motion for Summary Judgment, and deny Southport's Motion for Summary Judgment.

An appropriate Order follows.